RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
JONATHAN M. MORRIS (CA SBN 356152)
jonathanmorris@mofo.com
HOLLY M. PETERSEN (CA SBN 351588)
hollypetersen@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:    (415) 268-7000
Facsimile:    (415) 268-7522

BITA RAHEBI (CA SBN 209351)
brahebi@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017
Telephone:    (213) 892-5200
Facsimile:    (213) 892-5454

*Attorneys for Plaintiff*
FIGMA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FIGMA, INC.,<br><br>               Plaintiff,<br><br>     v.<br><br>MOTIFF PTE. LTD., YUANFUDAO HK LTD., and KANYUN HOLDINGS GROUP CO. LTD.,<br><br>               Defendants. | Case No. 3:24-cv-06507-JD<br><br>**FIGMA'S PRELIMINARY INJUNCTION MOTION**<br><br>Date: February 27, 2025<br>Time: 10:00am<br>Courtroom:  11<br>Judge:  Hon. James Donato |

1

## NOTICE OF MOTION

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

3

PLEASE TAKE NOTICE that at 10:00 am on Feb. 27, 2025, or as soon as the Honorable

4

James Donato may hear the matter in Courtroom 11 of the United States District Court for the

5

Northern District of California located at 450 Golden Gate Avenue, San Francisco, CA 94102,

6

Plaintiff Figma, Inc. ("Figma") shall move and does move for an order preliminarily enjoining

7

Motiff Pte. Ltd. ("Motiff"), Yuanfudao HK Ltd. ("Yuanfudao"), and Kanyun Holdings Group

8

Co. Ltd. ("Kanyun") from (i) preparing or reproducing unauthorized copies or derivatives of

9

Figma's flagship product, Figma Design, its accompanying "Dev Mode" feature, and its Help

10

Center documentation; (ii) contributing to the preparation or reproduction of unauthorized copies

11

or derivatives of the same; and (iii) reverse engineering or otherwise misusing the same.

12

Figma bases its motion on this Notice of Motion, its Memorandum of Points and

13

Authorities, the attached supporting declarations of Megg Meneguzzi, John Lai, Ph.D., Karan

14

Singh, Ph.D., W. Todd Schoettelkotte, and Richard S.J. Hung and exhibits, the record in this

15

matter, and the parties' additional written or oral arguments to the Court.

16

## RELIEF REQUESTED

17

Under Rule 65 of the Federal Rules of Civil Procedure, 17 U.S.C. § 502(a), and California

18

Code of Civil Procedure § 526(a)(2), Figma asks that the Court enter a preliminary injunction

19

prohibiting Motiff, Yuanfudao, and Kanyun, including their officers, employees, agents, servants,

20

and attorneys, and other persons and entities in active concert or participation with it from:

21

(1) selling, offering to sell, distributing, or using the Motiff product in the United States;

22

(2) inducing, aiding, assisting, or encouraging any other person or entity to use the Motiff

23

product in the United States;

24

(3) disseminating to any third party any portion of Figma's source code, object code,

25

ideas, know-how, or algorithms or any Motiff product incorporating the same;

26

(4) distributing the Motiff Help Center in the United States.

27

The Court should order Defendants to deliver copies of the injunction to officers, employees,

28

agents, servants, and other persons or entities in active concert or participation with them.

1

# **TABLE OF CONTENTS**

2

I.    INTRODUCTION ........................................................................................................... 1

3

II.   NATURE AND STAGE OF THE PROCEEDINGS ...................................................... 2

III.  STATEMENT OF FACTS ............................................................................................ 2

4

       A.    Figma & Figma Design ........................................................................................ 2

5

       B.    The Motiff Entities .............................................................................................. 2

6

       C.    The Master Services Agreement .......................................................................... 3

7

       D.    The Motiff Entities Access Figma Design to Launch a Cloned Product ............... 3

       E.    Motiff Launches Its Low-Priced Clone ................................................................ 3

8

       F.    Motiff's Product Is Not the Result of Honest Labor ............................................. 4

9

IV.   LEGAL STANDARD .................................................................................................... 7

V.    THE COURT SHOULD ENJOIN MOTIFF'S SALES OF ITS COPIED

10

       PRODUCT ..................................................................................................................... 8

11

       A.    Serious Questions Exist About Motiff's Infringement and Breach of

             Contract ............................................................................................................... 8

12

             1.    The Motiff Entities Have Infringed Figma's Copyrights ........................... 9

13

                   a.    Figma's Source Code and Documentation Are Copyrighted .......... 9

                   b.    The Motiff Entities Accessed Figma's Copyrighted

14

                         Materials ....................................................................................... 9

15

                   c.    The Motiff Product and Its Documentation Are Objectively

                         Similar to Figma's and Demonstrate Blatant Copying .................. 9

16

             2.    The Motiff Entities Breached the MSA's Prohibitions ............................ 11

17

       B.    Figma Will Face Irreparable Harm Absent Injunction ....................................... 12

             1.    Figma Has Already Lost Sales, and Its Losses Are Likely to

18

                   Accelerate ................................................................................................ 12

19

             2.    Figma Will Suffer Irreversible Price Erosion .......................................... 13

             3.    Figma Will Suffer Harm to its Reputation and Goodwill ........................ 13

20

             4.    Money Damages May Not Suffice ............................................................ 14

21

       C.    The Balance of Hardships Favors Figma ........................................................... 14

22

       D.    An Injunction Will Serve the Public Interest ..................................................... 15

VI.   CONCLUSION ............................................................................................................ 15

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Cases**

4

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)............................................................................... 13

5

*Apple Comput., Inc. v. Microsoft Corp.*,
6      35 F.3d 1435 (9th Cir. 1994)..................................................................................... 9

7

*Apple Inc. v. Psystar Corp.* (*"Psystar"*),
      673 F. Supp. 2d 943 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011)....... 12, 13, 14, 15

8

9

*Artifex Software v. Hancom, Inc.*,
      No. 16-cv-6982, 2017 WL 1477373 (N.D. Cal. Apr. 25, 2017)........................... 11

10

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
11      571 U.S. 49 (2013)................................................................................................. 15

12

*Broadcom Corp. v. Qualcomm, Inc.*,
      543 F.3d 683 (Fed. Cir. 2008)............................................................................... 14

13

*CNC Software, LLC v. Glob. Eng'g Ltd. Liab. Co.*,
14      No. 22-cv-2488, 2023 WL 3409463 (N.D. Cal. May 12, 2023)........................... 12

15

*Disney Enters., Inc. v. VidAngel, Inc.*,
16      869 F.3d 848 (9th Cir. 2017).................................................................................... 8

17

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
      717 F.3d 1336 (Fed. Cir. 2013)........................................................................ 13, 14

18

19

*eBay Inc. v. MercExchange, LLC*,
      547 U.S. 388 (2006)............................................................................................... 13

20

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*,
21      26 F.3d 1335 (5th Cir. 1994).................................................................................... 9

22

*Epic Games, Inc. v. Apple Inc.*,
      493 F.Supp.3d 817 (N.D. Cal. 2020) ..................................................................... 15

23

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
24      98 F.4th 1180 (9th Cir. 2024) ................................................................................... 7

25

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com LLC*,
26      586 U.S. 296 (2019)................................................................................................. 8

27

*Jain v. Unilodgers, Inc.*,
      No. 21-cv-9747, 2024 WL 478030 (N.D. Cal. Feb. 7, 2024) ........................... 8, 14

28

*MDY Indus., LLC v. Blizzard Entm't., Inc.*,
   629 F.3d 928 (9th Cir. 2010) ................................................................................. 11

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) ................................................................................. 10, 12

*Oracle USA, Inc. v. Rimini St., Inc.*,
   324 F.Supp.3d 1157 (D. Nev. 2018) ................................................................... 13

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011) ......................................................................... 14

*SAS Inst., Inc. v. World Programming Ltd.*,
   64 F.4th 1319 (Fed. Cir. 2023) ............................................................................ 9

*Skidmore v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020) .............................................................................. 8

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) .............................................................................. 12

*Talavera Hair Prods., Inc. v. Taizhou Yunsung Elec. Appliance Co.*,
   No. 18-cv-823, 2024 WL 2209794 (S.D. Cal. Apr. 1, 2024) ............................... 13

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*,
   920 F.3d 777 (Fed. Cir. 2019) ........................................................................... 14

*Toho-Towa Co. v. Morgan Creek Prods., Inc.*,
   159 Cal. Rptr. 3d 469 (Cal. Dist. Ct. App. 2013) ................................................ 11

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
   853 F.3d 980 (9th Cir. 2017) ............................................................................... 8

**Statutes**

17 U.S.C. § 502(a) ................................................................................................... 8

Cal. Civ. Proc. Code § 526(a)(2) ............................................................................. 8

1

## <u>TABLE OF ABBREVIATIONS</u>

2

| Phrase | Abbreviation |
|---|---|
| Figma, Inc. | "Figma" |
| Motiff Pte. Ltd. | "Motiff" |
| Yuanfudao HK Ltd. | "Yuanfudao" |
| Kanyun Holdings Group Co. Ltd. | "Kanyun" |
| Motiff, Yuanfudao, and Kanyun | "the Motiff entities" |
| Master Services Agreement | "MSA" |
| Declaration of John Lai, Ph.D. in Support of Figma's Preliminary Injunction Motion | "Lai Decl." |
| Declaration of Megg Meneguzzi in Support of Figma's Preliminary Injunction Motion | "Meneguzzi Decl." |
| Declaration of Richard Hung in Support of Figma's Preliminary Injunction Motion | "Hung Decl." |
| Declaration of Karan Singh, Ph.D. in Support of Figma's Preliminary Injunction Motion | "Singh Decl." |
| Declaration of Todd Schoettelkotte in Support of Figma's Preliminary Injunction Motion | "Schoettelkotte Decl." |

## I.    INTRODUCTION

Figma seeks to enjoin the Motiff entities' blatant copying and distribution of its software. After accessing and replicating Figma Design's user interface ("UI"), code, and help documentation, Motiff and its affiliates now seek to supplant Figma's product in the market by undercutting its pricing by 80%.

The story of theft spans multiple years and three related Motiff affiliates. Before Motiff existed, Yuanfudao entered into a MSA to obtain access to Figma's proprietary software. Under the MSA's terms, Yuanfudao agreed that neither it nor its affiliates would use that access to reverse engineer or create derivative works from Figma's software. Despite those prohibitions, Yuanfudao shared its access to Figma Design with Kanyun, which in turn produced a cloned product. Kanyun then created and incorporated Motiff to market and sell the cloned product.

The Motiff entities' copyright infringement and breach of the MSA are indisputable. The cloned Motiff product copies Figma Design's shaders, internal strings, data structures, database schemas, render tree, debugging tool, and UI. The Motiff product even duplicates bugs and inconsistent labeling in Figma's code and Figma's Help Center documentation.



This shameless theft warrants a preliminary injunction. Figma Design is among the world's most widely used design software platforms. By stealing Figma's intellectual property and discounting its prices to seize market share, the Motiff entities irreparably harm Figma's

competitive position, reputation, and goodwill.

The balance of equities and public interest both favor injunctive relief. Protecting creative investments is the central function of the copyright system, which promotes the progress of science and the useful arts. Enforcing binding contractual agreements barring the misuse of intellectual property does the same. The equities and public interest strongly disfavor the Motiff entities, which relied on Figma to develop their infringing product and launched it only recently.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Figma sued Yuanfudao, Kanyun, and Motiff on September 16, 2024, for breach of contract and copyright infringement. Figma then initiated service against all three entities under the Hague Convention. Proof of service on Kanyun by the Chinese Central Authority was received on January 15, 2025. (D.I. 20.) Defendants then stipulated to waiver of service on all three Motiff entities on January 23, 2025. (D.I. 26.)

## III.    STATEMENT OF FACTS

### A.    Figma & Figma Design

Figma is a leader in cloud-based design software. Its flagship product, Figma Design, enables distributed teams to efficiently collaborate on graphical designs. (*See* Lai Decl. ¶ 2.) Users can edit and comment on a design simultaneously, regardless of their location. (*See id*.)

Since its founding in 2012, Figma has devoted significant resources to developing and improving Figma Design to ensure its customers' satisfaction. (Meneguzzi Decl. Ex. 1.) Figma also offers a web-based Help Center. (Lai Decl. ¶ 4.)

Figma Design's source code and resulting UI are among Figma's most valuable assets. (*Id*. ¶ 3.) Figma secures its code with access-controlled repositories, device security, and confidentiality policies. (*Id*. ¶ 3.) Figma has registered the copyrights for its source code and Help Center documentation with the U.S. Copyright Office. (Hung Decl. Exs. 1-6.)

### B.    The Motiff Entities

Motiff was incorporated in Singapore on March 26, 2024. (*Id*. Ex. 7.) It is closely related to its two Chinese affiliates, Kanyun and Yuanfudao, which share a Beijing office. (*See id*. Exs. 8, 9.) Yuanfudao focused on ed-tech software until 2021, when China banned for-profit tutoring.

(*Id*. Ex. 10.)  It then reorganized with Kanyun as its new parent company.  (*Id*.)

Kanyun helped produce the infringing Motiff product.  (*Id*. Ex. 11.)  Yuanzu Yang once led Yuanfudao and is now Motiff's President and a Kanyun Vice President.  (*Id*.)  Employees of one entity use email addresses of another.  (*E.g.*, *id.*; Lai Decl. ¶ 6.)  For example, Motiff responded to Figma's infringement notice in the co-pending Singapore proceedings from a kanyun.com address.  (Hung Decl. Ex. 12.)

### C.    The Master Services Agreement

Yuanfudao and its affiliates agreed to Figma's MSA as a condition of accessing Figma Design.  (Meneguzzi Decl. Exs. 4, 8.)  Under MSA Section 3.A, they agreed not to:

> reverse engineer, decompile, disassemble or otherwise attempt to discover the source code, object code or underlying structure, ideas, know-how or algorithms relevant to the Figma Platform [or] modify, translate, or create derivative works based on the Figma Platform . . . or Documentation.

(*Id*. Ex. 8 § 3.A.)  They also agreed that "Figma owns the Figma Platform and Documentation" and that they received "[n]o ownership rights" in Figma's intellectual property.  (*Id*. § 5.A.)  They further agreed that they were "responsible and liable" for actions by their "Authorized Users" (*i.e.*, employees, contractors, and affiliates) and activities involving their accounts, "whether authorized . . . or not."  (*Id*. §§ 3.B, 1.A.)  California law governs the MSA.  (*Id*. § 16.)

### D.    The Motiff Entities Access Figma Design to Launch a Cloned Product

Yuanfudao agreed to the MSA by executing a service order on May 18, 2020. (Meneguzzi Decl. Ex. 4.)  Between May 2020 and August 2021, Figma provided Yuanfudao with four separate "Organization" accounts.  (*Id*. Exs. 4-7; *see also* Lai Decl. ¶¶ 5, 6.)  Yuanfudao facilitated Kanyun's access to these accounts.  (Lai Decl. ¶ 6).  Over this same period, Kanyun employees were developing the Motiff product.  (Hung Decl. Exs. 13, 14 (alleging that development began in October 2021), 28 (referring to Kanyun's involvement).)

### E.    Motiff Launches Its Low-Priced Clone

Two months after incorporating, Motiff launched its eponymous product in June 2024. (*Id*. Exs. 7, 15.)  In a blog post announcing the release, Motiff's co-founders asserted that the product's design required "significant effort," but without describing it.  (*Id*. Ex. 13.)  They also

1    suggested that Figma's own product merely inspired their own:

2          We owe a debt of gratitude to Figma . . . .  [Its] creation of a complex yet refined
          online graphic editor has been a source of constant learning for us.  Our product
3          and technology team have benefited immensely from Figma's blog shares.

4    (*Id*.)  As explained below, however, the Motiff product actually was a piratical copy of Figma's.

5    As an x.com user noted, Motiff had "ripped off [Figma's] UI down to the last icon."  (*Id*. Ex. 16.)

6    Responding to this criticism, co-founder Haoran (Ryan) Zhang admitted that Motiff had done this

7    intentionally to "reduce . . . user[s'] switching cost[s]."  (*Id*. Ex. 17; *see also id.* Exs. 16, 18.)

8          Within three weeks of its product launch, Motiff was aggressively pursuing Figma's

9    customers with the "best Figma alternative."  (*Id.* Exs. 19, 20.)  At Figma's annual conference,

10   Motiff brazenly circled the Moscone Center with a billboard truck.  (*Id*. Ex. 21.)  Motiff "quickly

11   secured its first batch of users" by setting its "pricing at 20 percent" of Figma's.  (*Id*. Ex. 22; *see*

12   *also id*. Exs. 18, 20 (trumpeting Motiff as a "painless switch from Figma" "at a fair price").)

13          **F.    Motiff's Product Is Not the Result of Honest Labor**

14         Motiff did not develop its product merely by reading "Figma's blog shares" or relying on

15   Figma Design as a "constant source of learning," as its co-founders claim.  In crucial and

16   unmistakable ways, the Motiff product performs identically to copied versions of Figma Design.

17   That duplication could not result from coincidence or by applying similar programming logic.

18         As Professor Karan Singh explains, software evolves during its development.  (Singh

19   Decl. ¶ 38.)  A programmer's decisions—how to express a function or data structure, how to

20   create a logical and intuitive interface, and how to phrase error messages and notifications—place

21   unique stamps on a product.  (*Id.* ¶ 38.)  "Bugs," programming remnants, and other idiosyncrasies

22   can establish programming lineage in software code.  (*Id.* ¶ 38.)  Independently developed pieces

23   of code are unlikely to reflect identical design choices and quirks.  (*Id.* ¶ 38.)

24         Here, the Motiff product's code, text strings, inefficiencies, and bugs reveal wholesale

25   copying of Figma Design's proprietary code.  As non-exhaustive examples:

26   •    **Copied shader and invoking code:**  A character-by-character (*i.e.*, "diff") comparison

27         shows that the Motiff product merely replaces variable names in Figma's shader code.

28         As shader code is tightly coupled to its invoking code, this suggests that the Motiff

product also copies Figma's invoking code.  (Compl. ¶¶ 36-38; Singh Decl. ¶¶ 40-50.)

- **Copied GPU strings:**  Via years of development effort and working with users, Figma has learned that specific graphics processing units ("GPUs") cause errors.  The newly launched Motiff product inexplicably uses the same set of hardcoded (and non-user visible) GPU strings to avoid these errors.  (Compl. ¶¶ 39-41; Singh Decl. ¶¶ 51-57.)

- **Copied idiosyncratic design decisions:**  Figma Design has a data transfer quirk that causes unnecessary repetitive data transfers to a GPU.  Figma Design also represents quadratic curves as cubic curves, which can affect performance adversely.  Although Motiff touts its alleged focus on performance (Hung Decl. Ex.14), the Motiff product employs these same idiosyncratic design decisions (Compl. ¶ 43; Singh Decl. ¶¶ 58-63.)

- **Copied data structures, autosave schema, render tree, and debugging tool:**  The Motiff product's document format uses similarly (often identically) named structures as Figma Design's, even when Figma veered from its own style conventions.  (Singh Decl. ¶¶ 64-77 (*e.g.*, inconsistent capitalization).)  Its autosave schema also mirrors an older version of Figma Design's, with simple substitutions.  (*Id.* ¶¶ 78-84.)  Its render tree and debugging tool further track Figma Design's.  (Compl. ¶¶ 44-50; Singh Decl. ¶¶ 85-87.)

- **Copied rendering bugs and idiosyncrasies:**  The Motiff product has identical rendering bugs and idiosyncrasies as Figma Design, suggesting source code copying.



In the images above (clockwise): (i) the bullseye's white gap is unintended; (ii) the curved segments should be continuous at the end of the lines; (iii) the heart emoji should

be red, not black; (iv) the flipping a gradient does not change its drop shadow; (v) the top hexagon should not be translucent; (vi) the dashed line is shorter than intended and corner is oddly shaped; and (vii) the white semicircle in rounded line end is an error. Converting line nodes to vector nodes in both products also unintentionally shifts the line a half pixel.  (Compl. ¶¶ 51-59; Singh Decl. ¶¶ 88-108.)

- **Copied paid features access bug:**  The Motiff product replicates an undisclosed bug that allows free-tier users to access paid features.  (Compl. ¶ 43; Singh Decl. ¶ 109.)

- **Copied interface look-and-feel:**  The Motiff product copies Figma Design's error, setup, onboarding, and editing panes, interface elements, and user workflows.  Examples of such copying appear below.  (Compl. ¶¶ 60-66; Singh Decl. ¶¶ 110-131.)  As noted, Motiff co-founder Haoran (Ryan) Zhang has conceded that the Motiff entities did this intentionally to "reduce the user's switching cost[s]" from Figma.  (Hung Decl. Ex. 17.)



- **Copied documentation:**  The Motiff entities even copied Figma's help documentation. Although they sometimes paraphrased the text to disguise their copying, the organization, layout, and titles of their articles are the same.  (Compl. ¶ 67; Singh Decl. ¶¶ 132-39.)



The inescapable conclusion is that the Motiff entities copied large swaths of Figma's UI, code, and documentation, appropriating years of Figma efforts.  Their product's virtually identical UI, code, data structures, databases, bugs, and other idiosyncrasies indicate its origins in Figma Design and confirm their breach of contract and copyright infringement.

## IV.    LEGAL STANDARD

A party is entitled to a preliminary injunction if it demonstrates (1) "serious questions going to the merits," (2) "a likelihood of irreparable injury," (3) "a balance of hardships that tips sharply towards the plaintiff," and (4) "the injunction is in the public interest."  *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011)).  The "serious questions" standard is "'a lesser showing than likelihood of success on the merits.'"  *Id.* (quoting *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)).

A court may "grant temporary and final injunctions on such terms as it may deem

1    reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a); *see Fourth*

2    *Est. Pub. Benefit Corp. v. Wall-Street.com LLC*, 586 U.S. 296, 308 (2019).  It also may grant a

3    preliminary injunction when a defendant has breached an agreement.  *See Jain v. Unilodgers,*

4    *Inc.*, No. 21-cv-9747, 2024 WL 478030, at *3 (N.D. Cal. Feb. 7, 2024) (injunction available "if

5    applicable state law would permit it"); Cal. Civ. Proc. Code § 526(a)(2) (injunction available

6    when "some act during the litigation would produce . . . irreparable injury").

7    **V.    THE COURT SHOULD ENJOIN MOTIFF'S SALES OF ITS COPIED PRODUCT**

8        **A.    Serious Questions Exist About Motiff's Infringement and Breach of Contract**

9        To establish copyright infringement, a party must "(1) show ownership of the allegedly

10   infringed material and (2) demonstrate that the alleged infringers violate at least one exclusive

11   right[.]"  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting

12   *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007)).

13       The second prong has two components: "copying" and "unlawful appropriation."  *See*

14   *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).  Copying can be proven

15   "circumstantially by showing that the defendant had access to the plaintiff's work and that the two

16   works share similarities probative of copying."  *Id.* at 1064.  "[S]imilarity may be based on the

17   overlap of unprotectable as well as protectable elements."  *Id*.  "[S]triking similarity" alone

18   suffices.  *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017).

19       For unlawful appropriation, the Ninth Circuit applies a two-part test to determine whether

20   the defendant's work is substantially similar to the plaintiff's copyrighted work.  *See Skidmore,*

21   952 F.3d at 1077.  "The first part, the extrinsic test, compares the objective similarities of specific

22   expressive elements in the two works."  *Id*. at 1064.  This requires "distinguish[ing] between the

23   protected and unprotected material in a plaintiff's work."  *Id.* (quoting *Swirsky v. Carey*, 376 F.3d

24   841, 845 (9th Cir. 2004)).  "The second part, the intrinsic test, 'test[s] for similarity of expression

25   from the standpoint of the ordinary reasonable observer, with no expert assistance.'"  *Id.* (quoting

26   *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008) and *Apple Comput., Inc. v.*

27   *Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994)).

28

1. **The Motiff Entities Have Infringed Figma's Copyrights**

      a.      **Figma's Source Code and Documentation Are Copyrighted**

Figma owns valid copyrights for its software and Help Center materials. U.S. Copyright Registrations TXu002441751, TXu002441752, and TXu002441753 protect versions of its source code. (Hung Decl. Exs. 1-3.) U.S. Copyright Registrations TXu002443057, TXu002443868, and TXu002443873 protect its Help Center documentation. (*Id.* Exs. 4-6.) When agreeing to the MSA, the Motiff entities acknowledged Figma's ownership of its copyrights in Figma Design and related documentation. (Meneguzzi Decl. Ex. 4, 8 § 5.A.)

      b.      **The Motiff Entities Accessed Figma's Copyrighted Materials**

Multiple employees of the Motiff entities accessed Figma Design between 2021 and 2024 with over 2000 unique accounts. (Lai Decl. ¶ 6.) They did so using "yuanfudao.com," "kanyun.com," and "motiff.com" email addresses. (*Id.* ¶ 6.) They also had access to Figma's Help Center. (*Id.* ¶ 4.)

Motiff's co-founders have admitted relying on Figma Design when developing the Motiff product. When announcing their product, they acknowledged their "debt of gratitude to Figma," that Figma Design served as a "source of constant learning for [them]" and that they "benefited immensely from Figma's blog shares." (Hung Decl. Ex. 13.) They also acknowledged trying to make the differences from Figma's product "as small as possible." (*Id.* Ex. 16.)

      c.      **The Motiff Product and Its Documentation Are Objectively Similar to Figma's and Demonstrate Blatant Copying**

Copyright protection extends to the literal and non-literal elements of a software program, *e.g.*, its architecture, structure, sequence, organization, operational modules, and interface. *See Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1341 (5th Cir. 1994); *Apple*, 35 F.3d at 1445 (applying Ninth Circuit test to UI); *SAS Inst., Inc. v. World Programming Ltd.*, 64 F.4th 1319, 1326 (Fed. Cir. 2023) (applying Fifth Circuit test to program output).

The Motiff product contains code, structures, interface elements, text, and bugs proving that the Motiff entities copied original and protectable elements of Figma Design. Motiff's own Help Center documentation also blatantly copies Figma's. All point to unlawful appropriation.

Examples of the Motiff product's copying appear below.  *See also* Section III(F), *supra*. Expedited discovery is likely to uncover even more examples.

- Shader and invoking code (Singh Decl. ¶¶ 40-50);
- GPU strings for rendering workarounds (*id.* ¶¶ 51-57);
- Idiosyncratic design decisions (*e.g.*, data transfer strategy, cubic curves) (*id.* ¶¶ 58-63);
- Data structures, autosave schema, render tree, and debugging tool (*id.* ¶¶ 64-87);
- Multiple rendering bugs and idiosyncrasies (*id.* ¶¶ 88-108);
- Paid features access bug (*id.* ¶ 109);
- Interface look-and-feel, including virtually identical GUIs, onboarding messages, warning and error messages, images, icons, layouts, toggles, visual styles, and options (*id.* ¶¶ 110-131); and
- Help Center documentation, with largely identical organization, topics, headings, and formatting, and identical or paraphrased text (*id.* ¶¶ 132-39).

The preceding aspects of Figma Design and its related documentation reflect the original expression of Figma employees.  Their usage in the Motiff product appears similar or even identical, whether objectively or from the standpoint of a reasonable observer.  As Dr. Singh explains, the likelihood that the Motiff entities developed the same bugs, data structures, schema, strings, look-and-feel, GUIs, messages, image, icons, layouts, toggles, visual styles, options, and documentation independently is vanishingly small.  (*Id.* ¶ 33-36.)

By hosting copies of their cloned product in the U.S. to optimize user performance (*id.* ¶¶ 37, 140-44), the Motiff entities directly infringe.  A serious question thus exists as to direct infringement.

Figma expects that the Motiff entities may deny direct infringement.  *E.g.*, Kanyun may attempt to argue that development of the cloned product occurred entirely outside the United States, and Motiff may argue that only its users are direct infringers.  Those contentions would not avoid a serious question as to infringement, as the Motiff entities would still infringe *indirectly*.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One infringes contributorily by intentionally inducing or encouraging direct infringement and

1    infringes vicariously by profiting from direct infringement while declining to exercise the right to

2    stop or limit it."); *MDY Indus., LLC v. Blizzard Entm't., Inc*., 629 F.3d 928, 939 (9th Cir. 2010)

3    (end users directly infringe when their computers copy software into RAM).

4         The Motiff entities knowingly copied Figma's code and documentation.  Motiff has

5    marketed its product in the U.S. and targeted Figma's U.S. customers, even brazenly driving a

6    billboard truck around the site of Figma's annual conference.  (Hung Decl. Ex. 21.)  Motiff hosts

7    its software on U.S. servers, distributes it for commercial gain, and has secured U.S. users with its

8    low pricing.  (Singh Decl. ¶ 140; Hung Decl. Exs. 18, 22.)  The Motiff entities thus also

9    contributorily infringe.

10         **2.    The Motiff Entities Breached the MSA's Prohibitions**

11         Under California law, a breach of contract claim requires: (1) the existence of a contract;

12    (2) plaintiff's performance under the contract; (3) defendant's breach of the contract; and

13    (4) plaintiff's damage as a result of the breach.  *See Artifex Software v. Hancom, Inc.,* No. 16-cv-

14    6982, 2017 WL 1477373, at *2 (N.D. Cal. Apr. 25, 2017).  The same evidence above indicates

15    that a serious question exists as to Figma's breach of contract claim.

16         The MSA is a contract between Figma and the Motiff entities and is governed by

17    California law.  Yuanfudao agreed to the MSA by executing a service order (Meneguzzi Decl.

18    Ex. 4), and Kanyun and Motiff agreed to it by using Figma Design.  (*Id*. Ex. 8 §1.)  Under

19    California's "single-business-enterprise" doctrine, the three entities also are bound to the MSA

20    because they have "integrate[d] their resources and operations to achieve a common business

21    purpose." *Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 159 Cal. Rptr. 3d 469, 479 (Cal. Dist.

22    Ct. App. 2013).  The entities share offices, employees, directors, and resources—all in pursuit of

23    their common purpose of selling the copied Motiff product.  (Hung Decl. Exs. 8, 9 (shared

24    offices), 11 (employees, directors, common purpose), 12 (emails); Lai Decl. ¶¶ 5, 6 (resources).)

25         Figma performed under the MSA by providing access to Figma Design.  (Meneguzzi

26    Decl. Ex. 8 § 2.B).  The Motiff entities breached it by "reverse engineer[ing], decompil[ing],

27    disassembl[ing], or otherwise attempt[ing] to discover [Figma Design's] source code, object code

28    [and] underlying structure, ideas, know-how[,] [and] algorithms" and by "creat[ing] derivative

works based on [Figma Design and its] [d]ocumentation." (*Id.* § 3.A ("Use Restrictions").)  The Motiff entities have harmed Figma at least by offering a cloned product and as discussed below.

### B.    Figma Will Face Irreparable Harm Absent Injunction

"Plaintiffs may establish an irreparable harm stemming from the infringement (*e.g.*, loss of market share, reputational harm)." *Grokster*, 518 F. Supp. 2d at 1215; *see also Apple Inc. v. Psystar Corp.* (*"Psystar"*), 673 F. Supp. 2d 943, 949 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011) ("difficult to calculate[ ]" damages qualify as irreparable harm); *CNC Software, LLC v. Glob. Eng'g Ltd. Liab. Co.*, No. 22-cv-2488, 2023 WL 3409463, at *7 (N.D. Cal. May 12, 2023)) ("[j]eopardy to [corporation's] competitive position caused by copyright infringement satisfies the irreparable harm requirement"); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill certainly supports . . . the possibility of irreparable harm.").  The irreparable harms discussed below are all attributable to the Motiff entities' infringement and breach. (Schoettelkotte Decl. ¶¶ 40-42.)

#### 1.    Figma Has Already Lost Sales, and Its Losses Are Likely to Accelerate

Figma Design is recognized as a market leader in collaborative design software.  (*E.g.*, Hung Decl. Ex. 22.)  Motiff directly targets Figma's business and has tried to lure its customers by undercutting its pricing by up to 80%.  (*Id*. Exs.19, 20 (ads touting ease of switching from Figma), 22 (discounted pricing)).

For at least these reasons, Motiff's "first batch of users" likely switched from Figma. (Schoettelkotte Decl. ¶¶ 18-30.)  And Figma's market share will likely decline as Motiff's cloned product, huge discounting, and targeted ads increasingly attract Figma customers.  (*Id.* ¶¶ 31-33.)

Absent an injunction, the Motiff entities' theft of Figma customers likely will accelerate over time.  Motiff's co-founders already tout the transfer of users from Figma to Motiff.  (*Id*. ¶¶ 26, 29; *see also* Hung Decl. Ex. 18.)  The longer the Motiff product remains available at cut-rate prices, the more likely it becomes that potential users will view the Motiff product as a reputable and feasible alternative to Figma's.  (*E.g.*, Schoettelkotte Decl. ¶¶ 34-38.)  Motiff's customer gains thus will be to Figma's direct detriment.

**2.    Figma Will Suffer Irreversible Price Erosion**

Courts have consistently recognized that price erosion constitutes irreparable harm in the intellectual property context.  *See, e.g.*, *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008) (in patent context, observing that "erosion of markets, customers, and prices, is rarely reversible").  The competitive harms from infringement are the same whether the exclusionary right arises from a patent or copyright.  *Cf. eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392 (2006) (analogizing tests for injunctive relief in copyright and patent contexts); *Talavera Hair Prods., Inc. v. Taizhou Yunsung Elec. Appliance Co.*, No. 18-cv-823, 2024 WL 2209794, at *3 (S.D. Cal. Apr. 1, 2024) (enjoining patent and copyright infringement based on common harms).

Here, the Motiff entities both undercut Figma's current prices by up to 80% and suggest that Figma Design is overpriced.  (Hung Decl. Exs. 18, 20, 22, 23.)  This jeopardizes Figma's pricing strategy and ultimately may force Figma to lower its prices to avoid losing market share.  (Schoettelkotte Decl. ¶¶ 29-33.)  The risk of price erosion constitutes irreparable harm.  *See Oracle USA, Inc. v. Rimini St., Inc.*, 324 F.Supp.3d 1157, 1164-65 (D. Nev. 2018) (injunction granted where defendant claimed plaintiff's products were "overpriced" and was able to offer lower prices only by infringing).

**3.    Figma Will Suffer Harm to its Reputation and Goodwill**

Reputational harm and loss of goodwill also support finding irreparable harm.  *See Psystar*, 673 F. Supp. 2d at 949.  One's "reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' [products], particularly products considered less prestigious and innovative."  *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344-45 (Fed. Cir. 2013).

Motiff's cloned software will cause reputational harm.  (Schoettelkotte Decl. ¶¶ 34-38.)  Users have characterized the Motiff product as a "bad [F]igma knockoff," "clone," "blind[] copy," "plagiar[ized]" version, and "copy-paste."  (Hung Decl. Exs. 24-26.)  One user "doubt[ed] [that] anyone would be able to tell the difference between" the two products.  (*Id.* Ex. 24.)  Another mistakenly thought that the Motiff product was a Figma "plugin."  (*Id.* Ex. 25.)  Figma Design will lose its "distinctiveness and market allure" if Motiff is allowed to sell a product with

"similar [copied] features." *Douglas Dynamics*, 717 F.3d at 1344.

### 4. Money Damages May Not Suffice

A defendant's inability to satisfy a judgment supports a finding of irreparable harm. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1150-51 (Fed. Cir. 2011) (inability to satisfy judgment contributed to "overwhelming evidence" of irreparable harm); see also *Jain*, 2024 WL 478030 at *3 (under California law, "insolvency or the inability to otherwise pay money damages is a classic type of irreparable harm"). Given the irreparable harm to Figma, money damages will not suffice. (Schoettelkotte Decl. ¶¶ 17, 18, 30, 31, 33, 34, 38, 39.)

Moreover, nothing suggests that the Motiff entities could even satisfy a monetary judgment. Motiff was incorporated just last year, two months before launching its eponymous product. (Hung Decl. Ex. 7, 15.) In view of Motiff's recent incorporation and likely sales growth, it may lack sufficient assets to satisfy a judgment in this action. This is especially true because, by design, its per-sale revenues are as low as 20% of Figma's. Its profits therefore likely will be less than Figma's lost profits, even if difficult to calculate. (Schoettelkotte Decl. ¶ 39.)

### C. The Balance of Hardships Favors Figma

The balance of hardships favors Figma. Although it offers a suite of products, Figma Design is the anchor. (Lai Decl. ¶ 2.) *See TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 792 (Fed. Cir. 2019*)* (plaintiff's focus "exposes it to a particular risk of lowered market share"). And absent an injunction, Figma would be forced "to compete against its own [copyrighted works], with the resultant harms" described above. *Robert Bosch*, 659 F.3d at 1156. This would "place[] a substantial hardship" on Figma. *Id.*

Any potential hardship to the Motiff entities is of no bearing, as it results from their own wrongdoing. "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986); *see also Psystar*, 673 F. Supp. 2d at 950 (defendant does not face "legitimate hardships as a result of being enjoined from committing unlawful activities").

1

### D.    An Injunction Will Serve the Public Interest

2

"[T]he public receives a benefit when the legitimate rights of copyright holders are

3

vindicated." *Psystar*, 673 F. Supp. 2d at 950. A preliminary "injunction reasonably tailored to

4

the circumstances of this litigation would serve no purpose other than to vindicate the legitimate

5

rights of [Figma] in its copyrights." *Id*. A preliminary injunction "would not harm the interests

6

of the public," but be "consistent with the policies underlying copyright protection" and "ensure

7

that the public will continue to benefit from the creative fruits of [Figma's] labor." *Id*.

8

The same is true of Figma's contract claim. The public "has a strong interest in holding

9

private parties to their agreements." *Epic Games, Inc. v. Apple Inc.*, 493 F.Supp.3d 817, 852

10

(N.D. Cal. 2020); *accord Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S.

11

49, 62–63, 66 (2013) ("'[T]he interest of justice' is served by holding parties to their bargain.").

12

The Motiff entities agreed not to reverse engineer or create derivative works of Figma Design or

13

its documentation, but did so. Having breached those obligations, they can hardly complain that

14

the public interest would be disserved if the Court enjoined distribution of the Motiff product.

15

### VI.    CONCLUSION

16

The Motiff entities blatantly copied Figma Design and its documentation and now attempt

17

to steal market share from Figma. Their actions, which violate federal copyright law and their

18

contractual obligations under the MSA, cannot continue. Figma respectfully requests the Court

19

enjoin the Motiff entities from distributing and selling the Motiff product and its related

20

documentation to prevent irreparable harm before trial.

21

22

Dated: January 23, 2025                    MORRISON & FOERSTER LLP

23

24

By: */s/ Richard S.J. Hung*
           Richard S.J. Hung

25

*Attorneys for Plaintiff*
FIGMA, INC.

26

27

28